Okay, the next argued case this morning is number 2012-1289, BIOSIG INSTRUMENTS v. NAUTILUS. Mr. Bonilla. And you can talk, Mr. Bonilla, about the obvious inaccuracy of these machines when they say, I weigh 20 pounds more than I really do. Your Honor, the... May it please the Court. The District Court's judgment of indefiniteness should be reversed because there's a clear, right-line test that's set forth in the intrinsic record that's unrebutted, that distinguishes what electrode configurations are inside the claim and which are outside of the claim. And that test is merely hooking up an oscilloscope, which is a standard piece of electrical equipment. Many of us have used it back in college some years ago. They go back generations. You hook it up to a differential amplifier, look at the input signals, look at the output signals. The input signals will show that you have muscle signals, you can't find the heart signal. You look at the output signal, if the electrodes are configured properly, you will have removed the muscle signals, leaving the traditional heart signal where you have an amplitude with an R-wave, and you can see that, and from that you can measure the heart rate. And the core of your argument is that any person skilled in the arts can do it. That's right, and it's unrebutted, Your Honor. There's no testing from Nautilus. They haven't even tried the test, or if they tried it, they haven't told us about it. So that's completely unrebutted, and once skilled in the arts can do it, there's testing from Dr. Golina, there's testing from Dr. Leckman. The patent examiner understood the testing, and we had another expert, Dr. Yunalus, which is extrinsic evidence, that confirmed the testing. And that's completely unrebutted. There's no expert, there's no person skilled in the arts, there's no testing, there's no evidence whatsoever. From the other side, it's their statutory burden to come forward with evidence to invalidate the patent. So let me ask you, I look at our Exxon research case, Honeywell, Power One, Aero Products, Board of Regents of Texas, University of Texas, I'm sure there are others. They all seem to say a claim is not indefinite if it can be construed. Correct? Yes, Your Honor. Here, the judge construed the claim. Correct. Albeit with a broad construction, not the narrow construction that Nautilus favored. So we have a claim construction, the judge construed it. Nobody seems to be saying it couldn't be construed. It was construed, isn't that the end of it? Simply because we have a claim construction here, albeit a broad one, that's the end of the case. I think that's generally true, Your Honor. In fact, it's interesting. In other words, why doesn't that end the issue right there? I think it does end the issue because the claim was construed, and now we're off in the claim application. And I think that does end the issue. And I think it's interesting that you raise that because when we did claim construction, indefiniteness wasn't raised. And that's typically the form where someone's going to raise indefiniteness. Now let me ask you, obviously if we say the claim is indefinite, the case is over. You lose. But if we say the judge erred in finding the case indefinite, it would go back to the district court. What remains pending there in the way of issues? Obviously infringement, I guess, but what in terms of validity issues? Well, infringement and damages, obviously. But there hasn't been a lot of discovery, actually, that's taken place. We didn't actually have expert reports before this happened. We haven't actually had a lot of factual discovery from Nautilus, the way this case was postured because of the previous litigation. There was a lot of things that did not happen in the previous litigation. Then Nautilus elected to go to reexample. Has Nautilus advanced some validity arguments? In the previous case, they advanced enablement and written description and invalidity over the prior art that they took to the Patent Office. And now that's all been litigated through the Patent Office. They seem to be continuing to advance the same arguments that are in the Patent Office. I can't speak for them. I was going to ask counsel the same question. So in other words, I'm trying to understand. In your view, if this case goes back, are there validity issues pending in the district court that would have to be resolved? We didn't have interrogatories when we went back to the district court, Your Honor, so it's hard for me to answer because we came out of the reexam, went back to the district court. The first thing the court did was schedule a markment. No discovery, no interrogatories, no contentions, no experts. We went to markment, and then the court said, after the markment decision, issued an order, said file summary judgment briefs if you would like, which Nautilus did. So we haven't had contentions. In the summary judgment, did it urge more than just indefiniteness? Yes, it did. It was like an omnibus motion. They argued non-infringement, anticipation, obviousness, and indefiniteness. So those were the issues that were raised. So they could go back and raise anticipation and obviousness and the things that were generally litigated in the reexam. Okay. I just wanted to clarify. Right. So there is work to be done. I don't know exactly what their positions would be on that. I do want to clarify to make sure that the court is clear on this catch-22 argument that they seem to try to make, they try to say, they line up all these devices and they say they look similar, they ought to be in or out, there's no test. Well, we did provide a test in the intrinsic record, and they never tried to apply it. So for them to say there's no test that distinguishes it isn't really fair when they haven't even applied the test. And those configurations are all different in many other respects, and this is a multi-faceted problem that depends upon electrodes, spacing, length, width, thickness. And for them to pick out one characteristic between those devices and say the length is greater than the width doesn't make them equal. They're just not. That's like saying all electrodes that are copper are equal. They're not because they have different lengths, thicknesses, widths, spacing, etc. So that Hobson's Choice argument that they've tried to create below and they've tried to create here is just not factually correct. And I'll reserve the rest of my time for rebuttal. Thank you, Your Honor. Okay. Thank you, Mr. Bonilla. Mr. Garinger. May it please the Court. Though a claim can be construed into other words, it does not end the indefinite inquiry as the Halliburton case, for example, cited in, for example, Star Scientific with a different result. We have a situation where the district court construed the claims. Granted, it adopted a very broad construction which may leave the claim subject to some kind of a validity challenge other than indefiniteness below. I don't know. You'd know better than me. But those cases that I looked at seem to say that if a claim can be construed, it's not indefinite. So why isn't that the end of the issue, at least on this issue here? Now maybe if it goes back, you'd win on some other issue below, but why doesn't that end the indefiniteness inquiry as far as we're concerned? Your Honor, because the words given to the claim still need to be applied. So we argued Halliburton insolubility for indefiniteness because though the judge raised indefiniteness at the district court level, he initially agreed with Nautilus that the file history did contain a disclaimer, paragraph 79, joint appendix 241, for example, in which the patentee said the prior art features wide electrodes with a narrow gap in between. The invention features narrow electrodes with a wide gap in between. The judge said, I think that's a clear statement. And though you point to some inconsistent statements, allegedly inconsistent statements elsewhere, the Hockerson-Halberstadt case, the DuPont case, these cases that say we will hold you to your clear statements. But none of that dealt with the space to part limitation we're dealing with here, did it? It dealt exactly with that, Your Honor. That's exactly what it dealt with. The judge said, I agree with Nautilus that those statements, such as paragraph 79 of JA241, they count, and I'm going to hold them. Biosig asked, could we submit another paper, Your Honor? We would like you to construe this term space relationship broadly. We don't think there was a clear disclaimer because we think the file history was unclear. We contradicted ourselves. The judge said, be careful. I think you are asking for a construction that will lead to invalidity by ambiguity. It's in the transcript. They asked for that broad construction with renewed paper. The judge granted their broad construction after making that due warning. We then moved for indefiniteness, and the judge said, I invited this motion, and we said, yes, by your remarks, that if we don't take that clear statement as disclaimer, it's still there. On page 13 of the red piece, we've circled the electrodes of four devices. Two of these are in. Two of these are out. Regardless of the words that the court was able to come up with for a space relationship, the second and fourth devices are clearly out, and nobody argues differently. Biosig argues that their test, which they read into the whereby clause, which came in only on reexam file history, it's not in the specification. It was not available to the person still in New York at the time of priority. It's not in any publication. They say that that whereby clause, which merely states the result, just provides a test that will put these two devices' space relationship outside that claim element. So the question is, in Haliburton, the question is, do you have the claimed fragile gel? In this case, the question is, do you have the claimed spacing? They all have a spacing between their four electrodes. My opposing counsel said, if the electrodes are configured properly. The claim, the apparatus claim, tells you how to configure the four electrodes properly. You need two on each side. Two are connected to a differential amplifier. Two are connected to each other. The claim recites this. The prior art recites this. All we were focused on is that physical structure, and that does tell you what you need for the whereby result. So two are in, two are out. That was the problem, and the judge said, well, I agree with Nautilus tentatively that those two are out for the reason you said they were out. This one, the tabs are too fat, the gap is too narrow. The one at the bottom, the e-factor, BioSIG said in the file history, never retracted. Those are asymmetric, so they can't be the right space relationship. Do we have the claimed space relationship? Yes, no, yes, no. Those two in the middle, on page 13, to say yes and no for those and to offer a test for a whereby clause where the person's skill in the art is supposed to do it, what they did was they took an unscaled patent, the Fujisaki 200, and they built one model, and they tested that one model with a new test that's not in the claim construction. It's a test that says, at the output of the differential amplifier, will the heart-to-muscle ratio, desired signal is the heart, muscle is the noise, will the signal-to-noise ratio exceed some number? They don't tell us what that number is. We know it's greater than 1.1, they say, and 2 would be good enough. Somewhere in there, there's a lower bound for a test that they injected only in re-exam and which is not in the claim construction, and that test is supposed to re-delineate that broad construction because that broad construction, as the district court confirmed on the record, covers all. That's Joint Appendix 2810, page 23, line 16 of the summary judgment transcript. I said, Judge, we lost. We argued that there was a disclaimer in the file history for what these electrode spacing must be, paragraph 79, for example, saying that in the invention, the rings are narrow and the gap between is wider. In contrast, in Fujisaki, the pads are fat and the gap is narrow. Another site for that is Joint Appendix 797. We've provided that intrinsic evidence the court initially agreed with, but then we lost. On reconsideration, he said, I'm going to give the broad language, even though he had warned them that he felt that would leave it indefinite, and we then did move to summary judgment. We said, based on the intrinsic evidence, not varying the claim construction, as these tests would do, but just based on taking that broad language, you can't distinguish these four, as you must. Mr. Bonilla said that indefiniteness was not raised to claim construction, as I mentioned. It certainly was. The judge raised it. The judge warned them, and the judge, then on summary judgment, said the construction you asked for can't be applied with the precision required by Hanford. What other issues are potentially pending? What validity issues are potentially pending in the district court? In the district court, Your Honor, very quickly, Your Honor, in this court there's also the IPXL issue, which we can address. In the district court, validity issues, if remanded, we have asked that if the court is not inclined to affirm on indefiniteness, that we get a clear construction of what the spaced relationship term should be. In other words, a definitive construction of the in-spaced relationship term. Was the district court's initial construction correct, and there was clear disclaimer, and I've cited the cases in the brief, why we think that was true, or was there a second construction? What Biosig proposed, correct. And then it's any spaced relationship will do. Did the district judge appear to accept the theory that it was acceptable to leave it open, that you figure out through trial and error what the spacing should be? Quite the opposite, Your Honor. He had a lot of trouble with trial and error. He thought that, as did the Halliburton Court and the United Carbon Court, the 1938 GE case, talking about the vice of functionality, the judge had a lot of trouble with this trial and error. And looking at the trial court transcript, you'll see that he thought  that was paragraph 69, this notion of spacing, materials, size, all of these factors which aren't clear, which aren't defined, and which he thought were just insoluble. So he did not think trial and error would be good. Isn't it more like tuning than trial and error? I think that is a fair point. They did say that the Fujisaki reference and the E-factor reference weren't tuned. I mean, they weren't balanced. They didn't show. The Fujisaki, they said, well, we measured it with this new test for an interim result. Remember, this where-by result, this where-by clause, even if you give it a patentable weight, which I don't think it should be given, even if you gave it to it, that's not the point of the device. The point of the device isn't for some interim signal. The point of the device is to get a heartbeat, to count heartbeats. They said that the E-factor was asymmetric to their own prior device that was not originally disclosed. It came in on re-exam. And on re-exam they said, well, the spacing is different on the left side than the right side. So that can't be balanced. It doesn't show the right tuning. Other issues remaining in this report. If there were remaining, certainly non-infringement, if-well, sorry, validity issues remaining. For other elements, Your Honor, I do submit that indefiniteness can be resolved on the single element of claim spacing or not, in or out on claim spacing. As a thought experiment for indefiniteness, we can assume, I think, that all the other elements would be met. The person still in the yard is struggling with the question, do I have the claim spacing or not? But if with a remand of on claim spacing in space relationship and whether the whereby clause has any weight, then certainly it would be open to on invalidity. There are other four electrode devices which connect two to the diff amp, two to each other, to try to cancel out what's the same and amplify what's different. By the way, the reason this helps is the heart's on one side of the body. So through your hands you actually are getting a little bit different heart signal. So there's a difference to amplify. Whereas by connecting, according to their expert, Dr. Galliano, by connecting two of the electrodes to each other and to ground, you create this crosstalk which kind of equalizes the muscle more. The heart's a muscle too, but not to be confusing. By equalizing those a bit more, you maximize more what gets canceled. So you're dampening down the muscle, ramping up the heart, and then you can have a gain. So that's the point. And remember her test was different than the re-exam test. Her test was when she built this device, the Galliano device, which is very dimensioned, indistinguishably from the Fujisaki device. And she said, the test is, can I get a heartbeat? And I'll use a filter. I'll put the signals into the differential amplifier. I'll take the output of that differential amplifier, put it into a bio-amplifier, which has filtering, a bypass filter, and which has an amplifier to amplify the heart signal. That's a very different test than the test that Dr. Leckman then introduced in which he said, filters are bad. Fujisaki would need filtering because it only has a ratio of 1.1. Well, 1.1, it took a weak heart signal, made it stronger than the muscle signal, and still could be further filtered and amplified, according to Dr. Galliano. Different test. So we really have two different tests. And the second one is not Dr. Leckman's test. It's not in the specification. It's not in the original file history. It's introduced 16 years, 17 years after, at least after the priority, even longer after the priority date. The person was still in the ER and had no access to that test. It's not published anywhere. There's no claim by anyone that this existed before Dr. Leckman coined it during the re-exam. Any more questions for Mr. Geringer? Any more questions? Okay. I think we have the position. Thank you, Your Honor. Thank you, Mr. Geringer. Mr. Bernelli. Thank you, Your Honor. I'd like to address a few points. And one, I'd like to talk about the claim construction versus what happened, because I think there's some confusion here. And what happened during claim construction was we argued for the claim construction space relationship, for lack of better words, a broader construction. And they argued that the claim should be limited based on a disavow of the structure during the prosecution. And they said biotech disavowed all structures where the electrode length was greater than the spacing between the electrodes. That was the argument. That cannot be true because we expressly showed structures of that type that were covered by the claim. Now, all structures that have length greater than spacing are not equal. They're not the same because it's a multifaceted problem based on length, spacing, material, width, thickness. And they agree with that point. If you look at JA905, when they asked for a second re-exam, they cite the DelVal reference. And this is in response to what we did during the re-exam. They said DelVal teaches that geometric configuration size and location spacing of the electrode configuration affects noise, which includes EMG. And that muscle noise spectrum is non-uniformly distributed and subject to a large degree of variability. So they were agreeing with that point. And so all these configurations are not the same just because they have four electrodes. And so the point being that during the claim construction, they argued for this disclaimer. We showed that that was not a disclaimer. And the point that the claim was allowed on and the point that was discussed during re-exam was whether the prior arc devices substantially removed EMG signals to the differential amplifier. You go throughout the prosecution history, look at JA142. That's the reason the claim was allowed and the reasons for allowing it. That was called the critical language, the essence of the invention, the essential feature. It wasn't the space relationship that was really being debated. It was removal of EMG. What is your response to Mr. Geringer's argument that Halliburton controls you? Halliburton does not control because in Halliburton, what was claimed was a fragile gel, an inherently subjective term that raises a problem in space. So you have a subjective term and the court said, well, let me look to the spec to see if I can define that term. And when you go to the spec, it was full of all types of other subjective terms. It was like easily thin, transitions relatively quickly, fast. There was a whole host of subjective terms. They said, well, that's not very helpful. So then they said, well, let's look at this graph. Maybe this graph will be able to tell us what fragility is. And they said, well, the graph, how fast something transitions from a liquid state to a gel state. And they said, well, I'll try to pick a definition out of the graph. The problem with that was the patentee admitted that the SF-12.1, I think prior art, exhibited that very same feature. And the patentee admitted that. So in that case, there was no way to define fragility and define it in a way that would not encompass the prior art. So the claim was indefinite. Here we don't have that problem because we don't, the only potentially subjective term is the substantial removal of EMG. And there's a clear guideline in the patent file history that shows how to do that with the oscilloscope meter testing. And if you look at the expansion case. You're saying it's more like star scientific because it's manipulable objectively. Exactly, Your Honor. If you look at the expansion, the star scientific case, if you look at the ENZO biochem case, those cases, the ones we started, they all have a guideline that one skill in the art can apply. And there's no evidence that one skill in the art can't apply the test. None. None. They even try it. So for them to say that they all have to be in or out is just incorrect. But I want to get back to the prosecution, the district court's claim construction because I think there's confusion. And the argument they were making was disclaimer. And what we said was there's no disclaimer because the file history did not disclaim on the point of the length ratio to the spacing. And for them to prove a disclaimer, they had to prove that there was an unmistakable assertion. And if the file history is ambiguous on the disclaimer point, they can't prove a disclaimer. But it wasn't ambiguous in distinguishing the references. Because it distinguished based on the ability to substantially remove EMG. If you go to JA-142, reasons for allowance, that was the reasons for allowance. Not the length versus spacing. If you look at JA-201-239, we talk about it's a multifaceted problem. This is the length, the width, the material. It's not just the length versus spacing. We talk about the total surface area. So the file history was there was no disclaimer, so it was ambiguous under the disclaimer law. But that doesn't mean that the claim is ambiguous. So they're taking ambiguity under to say that there's no ambiguity. The file history doesn't clearly disclaim something. And try to create that. It wouldn't be ambiguous if it's interpreted to exclude the references which were excluded during prosecution. That's right. The prosecution history reference, Fujisaki, did not disclose the substantial removal of EMG. If you look at the Fujisaki reference. Then why did you object to the district court's concern about a claim construction sufficiently limited to preserve validity? The claim construction that we argued for does preserve validity because the prior art doesn't substantially remove EMG. It does not have a structure for doing that. There's no express disclosure in Fujisaki of removing EMG. Fujisaki doesn't even mention EMG. It doesn't say anything about hand muscle signals. It doesn't even apply the word. So there's no express disclosure on its face. So then the question is, is it inherent within the Fujisaki reference? So we tried to show during the prosecution history, and were successful in doing so, that it's not inherent. And the reason is just like they say in J0905, reference to the DelVal paper, that they're saying it's a function of the spacing, the length, the width, the ratio. All these factors. So it's not inherent in Fujisaki. Fujisaki did not disclose substantially removing EMG. We argued that. The examiner accepted it, J142, reasons for allowance. So the claim, as construed, still distinguishes over the prior art. And it's not indefinite. It distinguishes over the prior art because Fujisaki doesn't substantially remove EMG. And it's not indefinite because you can apply the test to determine what's in and what's out. And so there is no problem with it reading on the prior art. And there was no evidence from Nautilus that the claim, in fact, does read on prior art. They didn't bring in an expert or a declaration that said, hey, this EMG removal is expressly stated in Fujisaki. And in fact, on JA904, they basically admit that it's not because they ask for a second re-exam and they say, it is true that Fujisaki does not expressly state that EMG is included in the human body noise. So there's no express disclosure. And they didn't bring in any evidence to show that it was inherent in Fujisaki. There's no expert saying it's inherently disclosed. They didn't do any testing to show that it was inherently disclosed. There's no proof. It's their burden of proof. And they didn't come forward with any. So the claim on its face distinguishes over the prior art. And it's not indefinite because you can apply the test to determine what's in and what's out. Okay. Any questions for Mr. Bedella? Any more questions? Okay. Thank you, Your Honor. Thank you. Thank you, Mr. Bedella and Mr. Garinger. The case is taken under submission. All rise.